1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON (175650)
*ron@consumersadvocates.com*
SKYE RESENDES (278511)
*skye@consumersadvocates.com*
ALEXIS M. WOOD (270200)
*alexis@consumersadvocates.com*
651 Arroyo Drive
San Diego, California 92103
Telephone:  (619) 696-9006
Facsimile:  (619) 564-6665
*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT A. MASON, individually and on behalf of all others similarly situated and the general public,<br><br>        Plaintiff,<br><br>    v.<br><br>HEEL, INC., a New Mexico Corporation,<br><br>        Defendant. | Case No.  3:12-cv-03056-GPC-KSC<br>Class Action<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>**[FILED CONCURRENTLY WITH DECLARATIONS OF RONALD A. MARRON, GAJAN RETNASABA AND PROPOSED ORDER; HEARING DATE SET PER ORDER AT DKT. NO. 27]**<br><br>Judge:        Hon. Gonzalo P. Curiel<br>Courtroom:  2D<br>Date:        March 7, 2014<br>Time:        1:30 p.m. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 1

II.     HISTORY OF THE LITIGATION ........................................................... 1

        A.   The Parties and the Pleadings......................................................... 1

        B.   The Parties' Negotiations Regarding Settlement ........................... 2

        C.   Plaintiff Engaged Defendant in Substantial Discovery................... 3

        D.   Motion for Preliminary Approval is Granted................................. 4

        E.   The Court Certified the Class for Settlement Purposes ................. 4

III.    TERMS OF THE SETTLEMENT ............................................................ 5

        A.   Five Modes of Injunctive Relief...................................................... 5

        B.   Monetary Relief................................................................................ 7

        C.   Costs of Notice and Administration, Attorneys' Fees,
             and Incentive Awards....................................................................... 8

        D.   Funding Successful Objections ....................................................... 8

IV.     STANDARD OF REVIEW ...................................................................... 9

V.      THE COURT SHOULD GRANT FINAL APPROVAL
        TO THE PROPOSED SETTLEMENT.................................................. 10

        A.   The Settlement was Reached Through Arm's Length Negotiations,
             by Experienced Class Action Lawyers, and was Based on
             Adequate Investigation and Discovery ......................................... 10

        B.   The Strength of Plaintiff's Case ................................................... 11

        C.   Complexity, Expense, and Probable Length of Litigation.......... 13

        D.   The Risk of Maintaining Class Action Status Throughout Trial .............. 13

        E.   The Settlement Amount Favors Final Approval .......................... 14

        F.   The Stage of the Proceedings and Discovery Favor Final Approval......... 15

        G.   The Views of Experienced Counsel Favors Final Approval...................... 16

        H.   The Reaction of Class Members to the Proposed Settlement ................... 16

i

I.   The Adequacy of the Notice Plan Supports Final Approval...................... 17

    1.  Content of the Notices........................................................... 17
    2.  Direct Notice to Class Members ........................................... 18
    3.  Magazines............................................................................. 18
    4.  Newspapers .......................................................................... 18
    5.  Press Releases ...................................................................... 19
    6.  Online Notice ....................................................................... 19
    7.  Additional Notice Efforts..................................................... 20
    8.  Notice to Attorneys General of Each State ........................... 20

J.   The Summary of Claims Information and Reaction of the Class
    to the Proposed Settlement Support Final Approval................................. 20

    1.  Total number of opt out requests received............................ 20
    2.  Total number of valid claims received.................................. 21
    3.  Total dollar amount to be paid to Class Members
       who submitted valid claim forms...................................... 21
    4.  Estimate of the amount to be paid to the Class Administrator ............ 22

K.   The Presence of a Governmental Participant .............................................. 22

L.   The Balanced Factors Weigh in Favor of Final Approval ......................... 22

VI.  CONCLUSION.................................................................................................. 22

1
2

# TABLE OF AUTHORITY

**Cases**

3

*Adams v. Inter-Con Sec. Sys., Inc.*,
   No. C-06-5428 MHP, 2007 WL 3225466 (N.D. Cal. Oct. 30, 2007) ....................... 10

4
5

*Boyd v. Bechtel Corp.*,
   485 F. Supp. 610 (N.D. Cal. 1979) ........................................................... 15

6
7

*Bruno v. Eckhart Corp.*,
   No. SACV 11-0173 DOC, 2012 WL 752090 (C.D. Cal. Mar. 6, 2012) ................... 13

8

*Churchill Vill., L.L.C. v. Gen. Elec.*,
   361 F.3d 566 (9th Cir. 2004)............................................. 9, 10, 16, 17

9
10

*Colgan v. Leatherman Tool Grp., Inc.*,
   135 Cal. App. 4th 663 (2006) ................................................................. 12

11
12

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) ................................................................ 15

13
14

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ............................................................. 9, 10

15

*In re Ferrero*,
   No. 11-CV-00205-H-KSC, 2012 WL 2802051 (S.D. Cal. July 9, 2012).................. 16

16
17

*In re GM Pick-up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995)...................................................................... 10

18

*In re Heritage Bond Litig.*,
   No. 02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ................... 9, 10

19
20

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000).................................................................... 14

21
22

*In re Nvidia Derivs. Litig.*,
   No. C-06-06110-SBA (JCS), 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008) .. 12

23

*In re Omnivision Techs.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2007) ..................................................... 13

24
25

*In re Syncor ERISA Litig.*,
   516 F.3d 1095 (9th Cir. 2008) ................................................................... 8

26
27

*In re Synthroid Mktg. Litig.*,
   110 F.Supp.2d 676 (N.D. Ill. 2000) .......................................................... 17

28

*In re Toys "R" Us Antitrust Litig.*,
   191 F.R.D. 347 (E.D.N.Y. 2000) .............................................................. 14

iii

*Mason v. Heel, Inc.*, Case No.  12-cv-3056-GPC-KSC

*In re Warner Commc'ns Sec. Litig.*,
 618 F. Supp. 735 (S.D.N.Y. 1985)..............................................................15

*Jaffe v. Morgan Stanley & Co.*,
 No. C 06-3903 TEH, 2008 WL 346417 (N.D. Cal. Feb. 7, 2008) ............................14

*Knight v. Red Door Salons, Inc.*,
 No. 08-1520 SC, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009)....................................9

*Mazza v. Am. Honda Motor Co.*,
 666 F.3d 581 (9th Cir. 2012)..............................................................13

*Mendoza v. Tucson Sch. Dist. No. 1*,
 623 F.2d 1338 (9th Cir. 1980) ..............................................................17

*Mullane v. Central Hanover Bank & Trust Co.*,
 339 U.S. 306 (1950)..............................................................16

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
 221 F.R.D. 523 (C.D. Cal. 2004) ..............................................................9, 13

*Officers for Justice v. Civil Serv. Comm'n*,
 688 F.2d 615 (9th Cir. 1982)..............................................................8, 14

*Riker v. Gibbons*,
 No. 3:08-cv-00115-LRH-VPC, 2010 WL 4366012 (D. Nev. Oct. 27, 2010) ...........14

*Rodriguez v. West Publ'g Corp.*,
 563 F.3d 948, (9th Cir. 2009)..............................................................13, 17

*Stuart v. Radioshack Corp.*,
 No. C-07-4499-EMC, 2010 WL 3155645 (N.D. Cal. Aug. 9, 2010)..................11, 14

*Taifa v. Bayh*,
 846 F. Supp. 723 (N.D. Ind. 1994) ..............................................................15

*White v. Experian Info. Solutions, Inc.*,
 803 F. Supp. 2d 1086 (C.D. Cal. 2011), *rev'd and remanded on other grounds sub nom.*, *Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157 (9th Cir. 2013) and 715 F.3d 1157 (9th Cir. 2013) ..............................................................14

*Young v. Polo Retail, LLC*,
 2007 U.S. Dist. LEXIS 27269 (N.D. Cal. Mar. 28, 2007)..........................................15

**Statutes**

15 U.S.C. § 2301 ..............................................................2

21 U.S.C. § 301 ..............................................................2

*Mason v. Heel, Inc.*, Case No.  12-cv-3056-GPC-KSC

28 U.S.C. § 1715 ............................................................................................ 20

28 U.S.C. § 1715(d) ....................................................................................... 20

Cal. Bus. & Prof. Code § 17200 .................................................................... 1

Cal. Bus. & Prof. Code § 17500 .................................................................... 1

Cal. Civ. Code § 1750 .................................................................................... 2

**Rules**

Fed. R. Civ. P. 23(a)(1)-(4) ........................................................................... 4

Fed. R. Civ. P. 23(b)(2) ................................................................................. 4

Fed. R. Civ. P. 23(b)(3) ................................................................................. 5

Fed. R. Civ. P. 23(e)(1) ................................................................................. 16

Fed. R. Civ. P. 23(e)(2) ................................................................................. 10

**Regulations**

21 C.F.R. § 1.1 ............................................................................................... 2

21 C.F.R. § 101.93(c)(1) ................................................................................ 6

**Other Authority**

FDA Compliance Policy Guide § 400.400 ..................................................... 6

Pursuant to the Court's Order Granting Preliminary Approval, Dkt. No. 27, Plaintiff Robert A. Mason respectfully submits this Memorandum of Points and Authorities in support of his Motion for Final Approval of the proposed classwide Settlement with Defendant.

## I. INTRODUCTION

This is a class action, certified for settlement purposes, in which Plaintiff asserted false and deceptive advertising of Defendant Heel, Inc.'s[1] homeopathic drugs. *See* Dkt. No. 1 at ¶¶ 32-34, 38, 40-42, 47, 49-52, 77-78, 99-100, 119-120; Dkt. No. 27 (Preliminary Approval Order, "PAO"). The action was settled in good faith after significant arm's length negotiations between the Parties, including through the use of an independent third party mediator, the Honorable Leo S. Papas (Ret.). As part of the settlement, Defendant has agreed to modify the labels of its homeopathic products in five significant aspects, to eliminate allegedly false and deceptive labeling and provide disclaimers that will advise consumers of the nature of Defendant's homeopathic drugs. On top of the strong injunctive relief provided by the settlement, Defendant has also established a substantial $1 million common fund in favor of the Class, to provide claimants full cash refunds, with a generous cap, and several other benefits. As a result, the instant Class settlement is not only just fair, reasonable and adequate, but is strongly in the Class' and the public's best interest. Accordingly, Plaintiff respectfully requests the Court grant the Settlement Agreement final approval.

## II. HISTORY OF THE LITIGATION

### A. The Parties and the Pleadings

In his Complaint, Plaintiff alleged that Defendant's representations regarding the characteristics, benefits, and abilities of the Products at issue were false and misleading, violating the Unfair Competition Law ("UCL", Cal. Bus. & Prof. Code §§ 17200, *et seq.*), False Advertising Law ("FAL", *id.* §§ 17500, *et seq.*), Consumers

---

[1] As used herein, Heel refers only to the United States-based company located in New Mexico, and not its parent company located in Baden-Baden, Germany.

Legal Remedies Act ("CLRA", Cal. Civ. Code §§ 1750, *et seq.*), and constituting a breach of express and implied warranties, violation of the Magnuson-Moss Warranty Act ("MMWA," 15 U.S.C. §§ 2301, *et seq.*) and unjust enrichment.  Compl. at ¶¶ 95-142.

On February 13, 2013, Defendant filed a motion to dismiss the complaint in its entirety.  Dkt. No. 6.  The parties fully briefed that motion, which involved lengthy and detailed analysis of, *inter alia*, whether the Food, Drug and Cosmetic Act (located at 21 U.S.C. §§ 301, *et seq.*) and its implementing regulations (located at 21 C.F.R. §§ 1.1, *et seq.*) (collectively, "FDCA") establishes federal preemption for deceptive advertising cases against homeopathic drug manufacturers; whether the Complaint made lack of substantiation claims; whether Defendant's advertising was required to be analyzed as a whole, or whether Defendant could parse out language and seek dismissal of some claims separately; and whether Plaintiff sufficiently alleged how Defendant was not following FTC advertising standards, among other claims and defenses.  *Id.*; Dkt. Nos. 7, 10-16.

Shortly after Defendant's motion was filed, on February 19, 2013, the Parties entered into a Stipulated Protective Order so that information could be shared for purposes of potential settlement discussions, which the Court granted on March 20, 2013.  Dkt. Nos. 8 & 9.  On May 30, 2013, Defendant withdrew its motion to dismiss due to the Parties having agreed to terms of a settlement, in principle.  Dkt. No. 17.

### B.   The Parties' Negotiations Regarding Settlement

The Settlement Agreement is the product of vigorous, adversarial, and competent representation of the Parties and substantive negotiations throughout the pendency of this litigation.  Dec. of Ronald A. Marron in support of Prelim. Approval (Dkt. No. 26-2, "PA Marron Decl.") ¶ 4.  The Parties began negotiations in earnest shortly before February 6, 2013, when Mason sent Heel a demand letter at Heel's request, outlining labeling changes he believed needed to be made to the Products, and why Heel's labeling claims were false, deceptive or unlawful and should be changed.

*Id.* The parties subsequently agreed to attend private mediation, and the settlement terms were reached with the assistance of an independent, impartial mediator, the Honorable Leo S. Papas (Ret.) of Judicate West. *Id.* at ¶ 5. The Parties attended an all-day formal mediation session before Judge Papas on April 23, 2013, and had follow-up individual mediation sessions with Judge Papas, to hammer out the details of the relief ultimately achieved. *Id.*

When settlement talks snagged on certain key provisions, the Parties continued to litigate and brief their claims and defenses in this action, primarily through Defendant's motion to dismiss. *See* Dkt. Nos. 6, 7, 11, 13, 14, 15, 16. For over five months, the Parties worked diligently to negotiate the final terms of a binding settlement agreement, both amongst counsel for the Parties and returning to Judge Papas for guidance in negotiating issues on which the Parties could not agree. PA Marron Decl. ¶¶ 4-6.

### C.    Plaintiff Engaged Defendant in Substantial Discovery

For the purposes of settlement, Defendant produced and Plaintiff reviewed substantial documentary evidence, and Class Counsel exercised due diligence to confirm the adequacy, reasonableness, and fairness of the settlement, both before and after mediation. *Id.* ¶¶ 7-8.[2]   Class Counsel also conducted a detailed and comprehensive review of Food and Drug Agency ("FDA") guidance documents regarding homeopathic and over-the-counter ("OTC") drugs; the FDCA and how it

---

[2] Among other investigative research, Class Counsel reviewed Defendant's sales data from Spins (an independent, third party data-gathering firm) for years 2010-2012; data from Defendant's internal accounting system tallying sales in pharmacies, internet, supermarkets and sporting goods stores from 2009-2012; mechanics of the Products' labeling at issue, including various proposals for modified labeling; Defendant's advertising; a list of Defendant's distributors; orders for the Products made by each of Defendant's relevant distributors for years 2009-2012; the Products' suggested retail sales prices, wholesale sales price, and unit sales throughout the United States; over a dozen clinical studies that Defendant claimed supported its clinical proof claims; lists of allopathic and homeopathic practitioners that purportedly recommend the Products to their patients; and Heel's profit and loss statements for its United States' based sales during the proposed Class Period. *Id.*

3

pertains to OTC homeopathic drugs; Federal Trade Commission ("FTC") advertising standards and their applicability to the Products' labeling claims at issue here, such as the "clinical proof" and "doctor recommended" claims. *See* Dkt. Nos. 10, 10.1, 10.2, 10.3. Class Counsel also conducted a detailed analysis of the Homeopathic Pharmacopeia of the United States ("HPUS"), and guidance documents put forth by the HPUS Committee, in its role approving homeopathic drug ingredients and setting forth minimal labeling standards for homeopathic drugs. *See*, *e.g.*, *id.*; Dkt. No. 16.

### D.    Motion for Preliminary Approval is Granted

On October 31, 2013, the Court granted the Parties' joint motion for preliminary approval of the Settlement, directed that the Class be notified, and set dates relevant to the Final Approval Hearing. *See* PAO. The Court found that the Settlement Agreement's terms appeared sufficiently fair, reasonable and adequate to warrant dissemination of notice of the proposed settlement to the Class. *Id.* at 4:1-7, ¶ 5. The Court also approved the Parties' proposed Notice Plan and Settlement Administrator. *Id*. at ¶ 10.

### E.    The Court Certified the Class for Settlement Purposes

In the PAO, the Court found that the requirements of Rule 23 were met for the proposed Class, and certified the Class for settlement purposes. *Id*. at ¶ 1-2. The Court appointed Plaintiff as Class Representative and the Law Offices of Ronald A. Marron as Class Counsel. *Id.* at ¶¶ 3-4.

The Court should reaffirm its Rule 23(a) and (b) findings, as the facts continue to support that: The class is numerous; common questions of law or fact exist regarding whether Defendant's labeling was false and deceptive; Mason's claims are typical of the Class' claims; Mason is an adequate Class Representative as he has no interests that conflict with those of the Class; and Class Counsel is qualified to adequately represent the class. *See id.* ¶¶ 1-4; Fed. R. Civ. P. 23(a)(1)-(4). Further, the five modes of injunctive relief apply evenly across the Class, benefit all Class Members equally, and the monetary relief springs out of the same harm that justifies

injunctive relief, such that certification under Rule 23(b)(2) is appropriate. *See* PAO ¶ 2. Also, common questions predominate over individual questions and class treatment is a superior mode of judicial relief than individual litigation of each Class Member's purchases, which average $25 per Product. *See id.*; Fed. R. Civ. P. 23(b)(3); Mot. in Supp. of Prelim Approval (Dkt. No. 26-1 at 16:24).

### III.  TERMS OF THE SETTLEMENT

**A.    Five Modes of Injunctive Relief**

Defendant has agreed to provide injunctive relief by modifying its Products' labels and Defendant's websites in five significant aspects.

First, Defendant will place a new "FDA Disclaimer" on each Product's external packaging stating the following:  "These statements have not been reviewed by the Food and Drug Administration.  They are supported by traditional homeopathic principles." Settlement Agreement § 4.1.1 (attached as Ex. 1 to PA Marron Decl.).  In addition, the FDA Disclaimer will be included in all Heel advertising to consumers that depicts a readable version of the Product's label, and all other Heel advertising to consumers that makes an Indication for Use-related claim.[3] *Id.* & Ex. E (exemplars of proposed new packaging for the Products).

Second, Defendant will implement a "Dilution Disclaimer" as a result of Plaintiff's claims about deceptive labeling regarding the level of dilution of the active ingredients in the Products.  The back panel of each Products' outer label or package shall be modified to include the following language, in close proximity to the Drug Facts:  "'X' is a homeopathic dilution.  For more information, see [URL]" which will refer customers to a designated Heel webpage for details (the "Dilution Webpage"). *Id.* § 4.1.2.  In connection with the Dilution Disclaimer, Defendant has agreed to modify all websites it owns or operates to include a Dilution Webpage, containing the

---

[3] Indications of Use are the statements that Plaintiff identified as false and misleading on the Products' packaging (e.g., "Natural Pain Relief" on Traumeel).  Compl., Ex. 1 at p. 4.

1   more detailed information contemplated by the Dilution Disclaimer. *Id.* § 4.1.9. The
2   new Dilution Webpage shall explain X dilution in a manner that substantially
3   conforms to the explanation provided by the HPUS, in a language understandable to
4   the average consumer with no knowledge of homeopathy, such as a question and
5   answer format, explaining the level of homeopathic dilution or method. *Id.* & Ex. F
6   (screenshots of proposed new Homeopathic Dilution Page). Defendant shall make the
7   Homeopathic Dilution Page readily accessible from its home pages, each Product's
8   individual webpage, if any, and directly from search engines, so that consumers do not
9   have to search for additional information. *Id.* Defendant shall also place a link to the
10  FDA Compliance Policy Guide § 400.400 ("CPG") on their websites. *Id.*

11      Third, Defendant has agreed not to label the Products with the words "natural,"
12  unless the Heel Products contain all natural ingredients. *Id.* § 4.1.3. Heel shall use the
13  term "natural" in a manner that is appropriately qualified (e.g., by using an asterisk
14  that links to the phrase: "Contains [X] natural active ingredients out of [X] actives, see
15  Drug Facts"). *Id.*

16      Fourth, Defendant has agreed to cease using the words "Clinically Proven,"
17  "Proven…Effective" or any similar representations that expressly or impliedly assert
18  medical, scientific or clinical proof on any Products for which it does not have at least
19  two clinical studies performed by independent researchers that utilize generally
20  accepted protocols such as randomized, double-blind placebo-controlled trials, with
21  publication and peer review ("RCTs"). *Id.* § 4.1.4.

22      Fifth, Heel shall cease using the words "Doctor Recommended" and "[Used] by
23  doctors worldwide" unless it also discloses to consumers the percentage of those
24  doctors who are homeopathic practitioners and the percentage who are allopathic or
25  any other type of medical practitioners. *Id.* § 4.1.5.

26      Plaintiff has assisted Defendant's efforts in relabeling their Products, to ensure
27  that the modified labels comply with the UCL, FAL, CLRA, and FDCA. The Dilution
28  Disclaimer was conceived by Plaintiff's Counsel, with the average consumer in mind.

1  Plaintiff's counsel also developed the FDA Disclaimer, which tracks language

2  required for FDA-approved OTC *non*-homeopathic products.   21 C.F.R. §

3  101.93(c)(1) ("This statement has not been evaluated by the Food and Drug

4  Administration.").   Similar FDA and Dilution Disclaimers were approved in *Gallucci*

5  on October 31, 2012, demonstrating their suitability for this Settlement.   *See Gallucci*

6  *v. Boiron, Inc.*, 2012 U.S. Dist. LEXIS 157039, at *16-17 CS. D. Cal. Oct. 31, 2012

7  (finding that the disclaimers "afford[] meaningful injunctive relief"); PA Marron Decl.

8  ¶ 15.

9  **B.    Monetary Relief**

10        On top of the injunctive relief set forth above, Defendant will also contribute

11  $1,000,000 to a non-recapture Settlement Fund.   Settlement Agreement § 4.2.1.

12  Defendant will have no ability to recover any of the contributed funds.  *Id.*  Through

13  the Fund, Defendant will provide a refund to all members of the Class who provide

14  proof of purchase of any of the Products, or affirm that they purchased any of the

15  Products, and return a Claim Form within the Claim-In Period.   *Id.* § 4.3.1.

16  Specifically, the refund shall be:  (i) for any Claimant who provides proof of purchase

17  (such as a receipt of product packaging), the actual purchase price as sworn to by the

18  Class Member, up to $25 per Product, subject to a cap of $150 per Claimant for all

19  claims (*Id.* § 4.3.2.1); or (ii) for any Claimant who does not provide proof of purchase,

20  the purchase price as sworn to on the claim form, up to $25 per Product, subject to a

21  cap of $100 per Claimant for all claims.  *Id.* § 4.3.2.2.  Payments to Class Members

22  may be subject to *pro rata* reduction if the aggregate number of claims exceeds the

23  Net Settlement Fund. *Id.* § 4.3.4.

24        In addition, if any funds remain in the Net Settlement Fund after all eligible

25  claims, attorneys' fees, expenses, and the incentive award have been paid, the

26  Settlement Agreement provides for distribution of any remaining funds as follows:  (i)

27  50% as a supplemental distribution to Class claimants; and (ii) 50% to a Court-

28  approved non-profit organization dedicated to informing consumers or advocating on

consumers' behalf about false and deceptive drug labeling concerns, such as Consumers Union, or in the alternative, to a non-profit organization that provides legal services on behalf of the indigent as set forth in California Code of Civil Procedure § 384. *Id.* §§ 1.20, 4.3.5.

**C.   Costs of Notice and Administration, Attorneys' Fees, and Incentive Awards**

All Notice costs shall be distributed from the Settlement Fund. *Id.* § 5.1. [*See also* Ex. G to Settlement Agreement.] The Notice Plan provided a broad range of notice through newspaper, magazine, and online media, as discussed *infra*.

Class Counsel has applied to the Court for an order awarding reasonable attorneys' fees and costs and an incentive award for the named Plaintiff as class representative. *Id.* § 9.1; Dkt. No. 30. Defendant has the option of responding to or contesting such application to the extent it exceeds thirty percent of the value of the Settlement for attorney's fees or $3,500 for class representative incentive award. Settlement Agreement § 9.1. Upon Court approval, the attorneys' fees, expenses, and incentive award will be paid from the Settlement Fund. *Id.* §§ 9.2, 9.4. Defendant shall bear its own attorney's fees, costs and expenses. *Id.* § 9.3.

**D.   Funding Successful Objections**

The Settlement Agreement requires Defendant to pay any additional attorney's fees incurred as a result of a successful objection, if the Parties revise the Settlement Agreement in a manner consistent with a successful objection, other than with respect to Class Counsel's attorney's fees. *Id.* ¶ 9.3.[4] Although it is unlikely this section will be invoked because of the strength of the settlement and the Class's overwhelmingly positive reaction, this provision—which is not routine—represents a real benefit for the Class because any fees associated with a successful objection will not be assessed against the Class's Settlement Fund.

---

[4] In the event the Court awards fees based on a successful, validly submitted objection related to the adequacy of representation by Class Counsel, the additional fees are to be paid from the Fee and/or Incentive award, a further benefit to the Class because the Settlement Fund will not be further diminished. *See id.* § 9.2.

*Mason v. Heel, Inc.,* Case No. 12-cv-3056-GPC-KSC

# IV.  STANDARD OF REVIEW

There is a strong judicial policy in favor of the pretrial settlement of class actions.  *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). Public policy also strongly "favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); *accord Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004).  Preliminary approval of a class action settlement "is committed to the sound discretion of the trial judge."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

The Court must evaluate the fairness of the settlement in its entirety.  *Id.* ("It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness . . . [t]he settlement must stand or fall in its entirety.").  But courts must give "proper deference to the private consensual decision of the parties" because "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties . . . must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties," and whether the settlement is fair, reasonable and adequate.  *Id.* at 1027; *see also Knight v. Red Door Salons, Inc.*, 2009 WL 248367, at *4 (N.D. Cal. Feb. 2, 2009) ("[t]he recommendations of Plaintiff's counsel should be given a presumption of reasonableness.") (citation and quotations omitted).

A district court's review of a proposed settlement is "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625.  A "presumption of fairness arises where: (1) counsel is experienced in similar litigation; (2) settlement was reached through arm's length negotiations; [and] (3) investigation and discovery are sufficient to allow

counsel and the court to act intelligently." *In re Heritage Bond Litig*., 2005 WL 1594403, at *2 (C.D. Cal. June 10, 2005); *see also Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (settlements that follow sufficient discovery and genuine arms-length negotiation are presumed fair).  Further, the Court may approve a class action settlement upon "finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *see also Officers for Justice*, 688 F.2d at 625.  In assessing the fairness, adequacy, and reasonableness of a settlement, courts balance:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill., LLC*, 361 F.3d at 575 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

## V.   THE COURT SHOULD GRANT FINAL APPROVAL TO THE PROPOSED SETTLEMENT

### A.   The Settlement was Reached Through Arm's Length Negotiations, by Experienced Class Action Lawyers, and was Based on Adequate Investigation and Discovery

"A presumption of correctness is said to attach to a class settlement reached in arm's-length negotiations between experienced capable counsel after meaningful discovery."  *In re Heritage Bond Litig.*, 2005 WL 1594403, at *9. Moreover, if the terms of the settlement are fair, courts generally assume the negotiations were proper. *See In re GM Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785-86 (3d Cir. 1995).

Here, the settlement negotiations took place between counsel for the Parties and involved the services of a competent, experienced, and independent mediator, the Honorable Leo S. Papas (Ret.).  PA Marron Decl. ¶ 5.  Plaintiff had an independent

10

law firm—The Law Offices of Ronald A. Marron—representing his interests and the interests of the putative Class; Defendant is represented by K&L Gates LLP. The fact that the Settlement was prompted by an experienced mediator demonstrates the Settlement was not collusive. *See, e.g.*, *Adams v. Inter-Con Sec. Sys., Inc.*, No. C-06-5428 MHP, 2007 WL 3225466, at *3 (N.D. Cal. Oct. 30, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."). The initial mediation session with Judge Papas was followed by approximately three months of detailed, informed, and adversarial negotiations between the Parties, both with and without Judge Papas' assistance, and overall negotiations lasted over five months before the Settlement Agreement was finalized. PA Marron Decl. ¶¶ 4-8. Additionally, the Settlement Agreement's prohibition on Defendant recovering any amounts that remain in the Settlement Fund provides substantial assurance that the Settlement Agreement reflects good faith on the part of the Parties. *See Stuart v. Radioshack Corp.*, No. C-07-4499-EMC, 2010 WL 3155645, at *4 (N.D. Cal. Aug. 9, 2010) (that there is "no reversion" of settlement monies to defendant "provides substantial assurance that the settlement reflect[s] good faith on the part of the negotiating parties").

Class Counsel is experienced in class actions generally, with lead counsel having over eighteen years of experience, by lawyers with particular experience in the FDCA and regulations affecting homeopathic drug labeling. PA Marron Decl. ¶¶ 12-27; Decl. of Ronald A. Marron in support of Fee Motion (Dkt. No. 30-2, "Marron Fee Decl.") ¶¶ 5-13. In addition, Class Counsel reviewed extensive documentation from Defendant, and independent third party data, about the Products' sales and advertising, and fully briefed a motion to dismiss that informed the parties about the strength and weaknesses of each other cases. PA Marron Decl. ¶¶ 7-8; Dkt. Nos. 6-7, 10, 13-15.

**B.   The Strength of Plaintiff's Case**

"It can be difficult to ascertain with precision the likelihood of success at trial. The Court cannot and need not determine the merits of the contested facts and legal

---

11

1    issues at this stage, and to the extent courts assess this factor, it is to determine
2    whether the decision to settle is a good value for a relatively weak case or a sell-out of
3    an extraordinary strong case." *Misra v. Decision One Mortg. Co.*, No. SA CV 07-
4    0994 DOC (RCx), 2009 WL 4581276, at *7 (C.D. Cal. Apr. 13, 2009) (internal
5    citation and quotations omitted).   Plaintiff believes he had a strong case that
6    Defendant's advertising was false or deceptive to consumers, based on arguments that
7    the average consumer is unaware of the high level of dilution in the Products and
8    could not determine that dilution level merely from seeing an "X" on the Products'
9    labels.  Plaintiff also alleges the average consumer is unaware that homeopathic drugs
10   are regulated differently than other over-the-counter medicines, including the lack of
11   awareness that the FDA does not even review, much less approve, the statements on
12   Defendant's packaging.   Thus Plaintiff believes he stood a realistic chance of
13   obtaining class certification, defeating all dispositive motions filed by Defendant, and
14   proceeding to a trial on the merits where he could establish each element of the
15   reasonable consumer test under the UCL, FAL and CLRA.  But getting to that point in
16   the litigation is no sure thing.

17         Plaintiff recognizes that Defendant has several factual and legal defenses that, if
18   successful, would defeat or substantially impair the value of Plaintiff's claims.  For
19   example, Plaintiff might not be able to: (1) satisfy his burden of demonstrating that the
20   Products are ineffective or that consumers are deceived; (2) overcome Defendant's
21   claim that certain claims may be expressly or implied preempted, or bared by the
22   primary jurisdiction or safe harbor doctrines; or (3) retain class certification through
23   trial.   Further, Defendant would likely assert they have clinical support for their
24   Products' efficacy claims, and present evidence that would be subject to expert
25   analysis, dueling reports and testimony.  And, even if Plaintiff established Defendant's
26   liability, he would still be required to establish damages or entitlement to injunctive
27   relief, an area that would also be subject to expert analysis, and competent offers of
28   proof sufficient to meet Plaintiff's burden. *See Colgan v. Leatherman Tool Grp., Inc.*,

135 Cal. App. 4th 663, 700 (2006) (holding that Plaintiffs have the burden of proving the proper amount of restitution, through "substantial evidence"). "The Settlement eliminates these and other risks of continued litigation, including the very real risk of no recovery after several years of litigation." *In re Nvidia Derivs. Litig.*, No. C-06-06110-SBA (JCS), 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008).

**C.    Complexity, Expense, and Probable Length of Litigation**

Plaintiff's claims involve complex and difficult regulatory issues under the FDCA, OTC drug marketing standards, and the deceptiveness of the Products' labeling. The costs and risks associated with continuing to litigate this action would require extensive resources and Court time, such as expert testimony and *Daubert* motions. "Avoiding such a trial and the subsequent appeals in this complex case strongly militates in favor of settlement rather than further protracted and uncertain litigation" *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 527. Thus, "unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Id.* at 526.

**D.    The Risk of Maintaining Class Action Status Throughout Trial**

While Plaintiff strongly believes that class treatment is appropriate for all reasons set forth in the Preliminary Approval Motion, there is a genuine risk that Plaintiff will not be able to maintain class action status through trial. Other than consenting to class certification for the purposes of settlement only, Defendant would vigorously oppose class certification. *See* Settlement Agreement §12.4. And, even if the class were certified, Defendant might seek decertification or modification of the class. *See*, *e.g.*, *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d, 1036, 1041 (N.D. Cal. 2007); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009). *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012) has served as the impetus for a number of decertification motions. *See*, *e.g.*, *Bruno v. Eckhart Corp.*, No. SACV 11-0173 DOC, 2012 WL 752090 (C.D. Cal. Mar. 6, 2012). In contrast, by settling the action, Defendant effectively accedes to certification and "there is much less risk of

13

1   anyone who may have actually been injured going away empty-handed." *In re*

2   *Omnivision Techs.*, 559 F. Supp. 2d at 1041-42.  Accordingly, this factor weighs in

3   favor of final approval.

4   **E.      The Settlement Amount Favors Final Approval**

5          The Settlement provides strong monetary relief for the Class and achieves

6   everything the Plaintiff sought in his Complaint.   The Settlement is also fair,

7   reasonable and adequate, allowing the Class to be compensated up to $150 per

8   Claimants who have proof of purchase(s) and up to $100 per Claimants who do not

9   have proof of purchase(s).  Settlement Agreement § 4.3.2; Decl. of Ronald A. Marron

10  filed concurrently herewith ("FA Marron Decl.") ¶ 3.  In addition, these payments will

11  be achieved without the delay associated with further litigation.

12         The Settlement also provides that unclaimed funds will not revert to Defendant.

13  Settlement Agreement § 4.2.1; *see Stuart*, 2010 WL 3155645, at *4 ("no reversion" of

14  settlement monies to defendant "provides substantial assurance that the settlement

15  reflect[s] good faith on the part of the negotiating parties").[5]

16         Further, the injunctive relief provided for in the Settlement cannot be

17  overlooked.  It will address the harm allegedly caused to consumers and provides

18  Plaintiff with the relief he most desires – a change in product labeling.  The value of

19

20  ─────────────────
    [5]   *See also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000); *Jaffe*

21  *v. Morgan Stanley & Co.*, No. C 06-3903 TEH, 2008 WL 346417, at *9 (N.D. Cal.

22  Feb. 7, 2008) ("The settlement amount could undoubtedly be greater, but it is not
    obviously deficient, and a sizeable discount is to be expected in exchange for avoiding

23  the uncertainties, risks, and costs that come with litigating a case to trial.").  "Courts

24  must tread cautiously when comparing the amount of a settlement to speculative
    figures regarding what damages might have been won had [plaintiffs] prevailed at

25  trial.  (Citations and internal quotation marks omitted.)  Indeed, 'the very essence of a

26  settlement is compromise, a yielding of absolutes and an abandoning of highest
    hopes.'"  *White v. Experian Info. Solutions, Inc.*, 803 F. Supp. 2d 1086, 1098 (C.D.

27  Cal. 2011) (quoting *Officers for Justice*, 688 F.2d at 624), *rev'd and remanded on

28  other grounds sub nom.*, *Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157 (9th
    Cir. 2013) and 715 F.3d 1157 (9th Cir. 2013).

─────────────────
                                         14

1    this substantive and widespread change to Defendant's practices cannot be overstated.

2    *See Riker v. Gibbons*, No. 3:08-cv-00115-LRH-VPC, 2010 WL 4366012, at *4 (D.

3    Nev. Oct. 27, 2010) (approving a settlement for injunctive and declaratory relief,

4    finding that it "achieve[d] the goals of the lawsuit"); *In re Toys "R" Us Antitrust*

5    *Litig.*, 191 F.R.D. 347, 353-54 (E.D. N.Y. 2000) (noting "expeditious" and "deterrent"

6    effect of class action settlements, compared to the difficulties and costs of continued

7    litigation).

8    **F.    The Stage of the Proceedings and Discovery Favor Final Approval**

9           The greater the amount of information shared between the parties, the more

10   likely it is the parties have "a clear view of the strengths and weaknesses of their

11   cases." *Young v. Polo Retail, LLC*, 2007 U.S. Dist. LEXIS 27269, at *12 (N.D. Cal.

12   Mar. 28, 2007) (quoting *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745

13   (S.D. N.Y. 1985)).  "[I]n the context of class action settlements, 'formal discovery is

14   not a necessary ticket to the bargaining table' where the parties have sufficient

15   information to make an informed decision about settlement."  *Linney v. Cellular*

16   *Alaska P'ship*, 151 F.3d 1234, 1239 (9th. Cir. 1998) (citation and internal quotations

17   omitted).  This is especially true "where there has been sufficient information sharing

18   and cooperation in providing access to necessary data[.]"  *Misra*, 2009 WL 4581276,

19   at *8; *see also Taifa v. Bayh*, 846 F. Supp. 723, 728 (N.D. Ind. 1994) (same).

20          Here, Plaintiff engaged in substantial informal discovery, reviewing

21   Defendant's financial and marketing information; confirmatory third party sales data,

22   such as SPINS; lists of doctors who allegedly recommended certain of the Products;

23   and scientific articles purportedly supporting the Products' efficacy.  PA Marron Decl.

24   ¶¶ 7-8.  Class Counsel also reviewed FDA guidance documents, the FDCA, FTC

25   standards, and background evidence relating to the Products' claims – both to prepare

26   the Complaint and to oppose Defendant's motion to dismiss – and were accordingly

27   armed with the knowledge of the strengths and weaknesses of their claims and

28   defenses.  *See* Dkt. Nos. 6, 7, 10-16.  Thus, the Parties had sufficient information to

make an informed decision about the terms of the Settlement Agreement and this factor weighs in favor of final approval.  *See id.*; PA Marron Decl. ¶¶ 7-8.

## G.    The Views of Experienced Counsel Favors Final Approval

In contemplating the approval of a proposed settlement, "[t]he recommendations of Plaintiff's counsel should be given a presumption of reasonableness."  *Knight*, 2009 WL 248367, at *4 (citing *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979)); *see also Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 528 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).  Indeed, "Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation."  *In re Pacific Enters. Secs. Litig.*, 47 F.3d at 378.  Thus, "the Court should not without good cause substitute its judgment for [counsel's]."  *Boyd*, 485 F. Supp. at 622.

Here, "[i]n addition to being familiar with the present dispute, Plaintiff[s'] counsel has considerable expertise in . . . consumer and class action litigation."  *Knight*, 2009 WL 248367, at *4; PA Marron Decl. ¶¶ 12-29; Marron Fee Decl. ¶¶ 5-13.  There is also nothing to counter the presumption that counsel's recommendation is reasonable.  *See* FA Marron Decl. ¶ 3.

## H.    The Reaction of Class Members to the Proposed Settlement

Here, no Class members have opted out or objected to the Settlement.  Decl. of Gajan Retnasaba filed concurrently herewith ("Retnasaba Decl.") ¶¶ 16, 18-19.  Further, no Attorneys General have filed objections or commented negatively on the Settlement in response to CAFA notice.  *Id.* ¶ 2; FA Marron Decl. ¶ 4; Decl. of Matthew G. Ball in Support of Order for Final Approval of Settlement ¶¶ 3-4.  The absence of any objections to the proposed Settlement raises a strong presumption that the terms of the settlement are favorable to the Class.  *See*, *e.g.*, *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 984, 967 (9th Cir. 2009) (objection rate of 0.014 supported approval of the settlement); *Churchill Vill., LLC*, 361 F.3d at 577 (affirming approval of a class action settlement where 90,000 class members received notice, and 45

16

objections were received).  Accordingly, the reaction of the Class and other interested parties weighs in favor of preliminary approval.

## I.        The Adequacy of the Notice Plan Supports Final Approval

The Notice Plan was adequate, supporting final approval.  Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  "When approving a settlement, a court must ensure that notice is made in a 'reasonable manner to all class members who would be bound by the proposal.'" *In re Ferrero Litig.*, No. 11-CV-00205-H-KSC, 2012 WL 2802051 at *2 (S.D. Cal. July 9, 2012) (citing Fed. R. Civ. P. 23(e)(1)).  *See also* PAO at ¶ 10 (approving Notice Plan).  Here, the Notice Plan was based on the Class Administrator's research, to determine the most effective way to reach U.S. adults who trust homeopathic remedies, and who would be potential Class members.  *See* Settlement Agreement, Ex. G; Retnasaba Decl. ¶¶ 3-8, 11.  As discussed in more detail below, the Claims Administrator followed the Court's Order on Notice.  *See* PAO ¶¶ 10-13; Retnasaba Decl. ¶¶ 1-19.

### 1.  Content of the Notices

"Settlement notices are supposed to present information about a proposed settlement neutrally, simply, and understandably . . . ." *Rodriguez*, 563 F.3d at 962 (rejecting argument that notice should have included "the expected value of fully litigating the case").  Here, the Notice presented the relevant information in an eye-catching but neutral manner, using understandable terms.  *See* Retnasaba Decl., Exs. A-C.  The Notice also included all information necessary to comply with due process, stating, *inter alia*, the subject matter of this litigation; that a settlement had been reached and the amount of the monetary fund; the amount each Class member could receive; how to file a claim; that each Class member had the right to exclude themselves from the Settlement Class or object, and how to exclude themselves or object; Class Counsel's intent to apply for attorneys' fees, expenses and compensation

for the named Plaintiff, and how and when to view those documents; the date of the Fairness Hearing and location of the Court and Court Clerk; contact information for the Claims Administrator; and instructions to view the Settlement Website for more details and to obtain a claim form. *See id.* This met the requirements of Rule 23 and due process. *See*, *e.g.*, *Churchill Vill., LLC*, 361 F.3d at 575 ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'") (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980)); *In re Synthroid Mktg. Litig.*, 110 F. Supp. 2d 676, 680 (N.D. Ill. 2000) ("direct mailings, toll-free 1-800 numbers, websites, and [a] call center are reasonable steps" to notify a class); *In re Ferrero Litig.*, 2012 WL 2802051, at *3 (finding notice adequate when it contained basic terms of settlement agreement and means to read full agreement, date of fairness hearing, class counsel's intent to move for fees and incentive awards, and each class members' right to object or opt out). The Claims Administrator also distributed the Notice Consistent with the Court's Order. *See* Retnasaba Decl. ¶¶ 4 & Exs. A-C; PAO ¶ 10.

### 2. Direct Notice to Class Members

The Products were not sold direct-to-consumers and Defendant did not have direct contact information for any Class members. Decl. of Christian Grimm (filed under seal at Dkt. No. 23) ¶ 3. Therefore, notice by publication was the best notice practicable under the circumstances and reasonable. *See id.*; Fed. R. Civ. P. 23(e)(1).

### 3. Magazines

The Claims Administrator published Notice of the Settlement in the January issue of *Prevention* magazine, a health-related journal that has a circulation of 2,800,000 individuals and audience of 8,600,000. Retnasaba Decl. ¶ 5 & Ex. B.

### 4. Newspapers

The Claims Administrator published Notice of the Settlement in the nationwide edition of the New York Times, which has a circulation of 1,500,000 individuals and

an audience of 3,700,000; and in the San Diego Union Tribune once a week for four weeks, sufficient to meet CLRA notice requirements.  *Id.* ¶¶ 3, 5 & Exs. A & B.

### 5.  Press Releases

On January 30, 2014, the Claims Administrator issued a party-neutral press release over PR Newswire's US1 National Newsline, which provided the release to thousands of media outlets across the country, including national and local newspapers, websites, television and radio stations.  Retnasaba Decl. ¶ 6 & Ex. C. The press release was picked up and republished by over 300 media outlets.  *Id.*

### 6.  Online Notice

On or before November 14, 2013, the Claims Administrator commenced a targeted online notice plan that included Google Display Network and Microsoft (Bing/Yahoo) Display Network banner advertising; a dedicated Facebook page to provide information to potential class members and others seeking information about the proposed settlement; and ads on consumer class action websites.  *See id.* ¶¶ 7-8. This online advertising campaign generated more than 120,000,000 impressions as of February 10, 2014.  *Id.* ¶ 9.  Out of those impressions, 10,000,000 were unique, which establishes the deep level of "reach" achieved for the online part of the notice plan. *Id.* ¶ 10.

On or before November 13, 2013, the Claims Administrator also established an interactive, dedicated Settlement Website to provide information to potential class members and others seeking information about the proposed settlement, and to facilitate      the      filing      of      online      claims,      appearing      at www.HeelClassActionSettlement.com.  *Id.* ¶ 11.  The Settlement Website provided: (a) a list of Defendant's products addressed in the litigation; (b) an online claims filing feature which allows class members to file a claim online and upload supporting documentation where applicable; (c) answers to frequently-asked questions; (d) important dates; (e) contact information for the Claims Administrator, including a case-dedicated mailing address, toll-free telephone number, and email address; and (f)

full and complete copies of the following documents: (1) Notice of Proposed Class Action Settlement (in English and Spanish); (2) Claim Form (in English and Spanish); (3) Settlement Agreement; (4) Preliminary Approval Order; (5) Complaint; (6) the Court's Amended Order Preliminarily Approving Class Action Settlement, Certifying the Class, Providing for Notice and Scheduling Order; (7) motions to seal and orders granting motions to seal; and (8) Class Counsel's Motion for Attorney's Fees, Costs and Incentive Award for the Class Representative. *Id.* ¶¶ 12, 15. As of January 30, 2014, the Settlement Website had registered 33,000 unique visitors. *Id.* ¶ 11.

### 7. Additional Notice Efforts

The Claims Administrator also established a toll-free telephone number, with live operators. *Id.* ¶ 14. The number received eleven calls from Class members and other interested persons. *See id.* No Class member has complained about the sufficiency of the notice or the claims procedures. *Id.* ¶ 16.

### 8. Notice to Attorneys General of Each State

Pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, on October 29-30, 2013, Defendant's attorneys served 51 Notice of Settlement packages upon all Attorneys General in the United States, its possessions and territories and the U.S. Attorney General. Ball Decl. ¶ 3. No Attorney General objected. *Id.* ¶ 4; Retnasaba Decl. ¶ 2; FA Marron Decl. ¶ 5. The 90-day window between giving notice and when a final approval order may be entered has expired. 28 U.S.C. § 1715(d).

## J. The Summary of Claims Information and Reaction of the Class to the Proposed Settlement Support Final Approval

### 1. Total number of opt-out requests and objections received

The opt-out and objection deadline for this matter was February 5, 2014. PAO at ¶¶ 7, 18. To date, no requests to opt out from the Settlement Agreement have been received. Retnasaba Decl. ¶ 18; FA Marron Decl. ¶ 5. No objections have been received. Retnasaba Decl. ¶ 19; FA Marron Decl. ¶ 5. Given the millions of unique impressions that the print and online versions of the Notice achieved, the existence of

1    zero requests for exclusion and zero objections from the Class weigh in favor of final

2    approval.  *See* Retnasaba Decl. ¶¶ 3, 5-6, 9-10, 13.

3                    **2.    Total number of valid claims received**

4            The claims filing deadline for this matter will not expire until ninety days after

5    final judgment is entered.  PAO at ¶ 17.  To date, 341 physical claim forms and 9,633

6    online claim forms, for a total of 9,974 filed claims, have been received.  Retnasaba

7    Decl. ¶ 17.  The Claims Administrator anticipates receiving 18,000 claims total by the

8    time the June 5, 2014 claims deadline is reached.  *Id.*  Subtracting for duplicates and

9    eliminating for fraud, an approximate net of 13,500 claims for monetary relief by

10   Class members is expected.  *Id.*

11                   **3.    Total dollar amount to be paid to Class Members who submitted**

12                   **valid claim forms**

13           The estimated 13,500 unique claims received in this matter, *see id.*, will be

14   subject to pro rata reduction as set forth in the Settlement Agreement, § 4.3.4.  Based

15   on the amount remaining in the Settlement Fund after subtracting attorney's fees,

16   costs, incentive award, taxes and claims administration, Class members will receive an

17   estimated $488,452.30 in the aggregate, or $35.89 each.  Retnasaba Decl. filed in

18   support of Fee Motion (Dkt. No. 30-4, "Retnasaba Fee Decl.") at ¶ 7.  Even though the

19   Settlement Agreement provides that fifty percent of excess funds be allocated to a

20   non-profit *cy pres* recipient, Settlement Agreement § 4.3.5, this fall back provision is

21   not necessary.  No money will remain in the Settlement Fund for distribution on a *cy*

22   *pres* basis because sufficient claims were made to provide cash refunds to all Class

23   members who made a claim.  *See* Retnasaba Fee Decl. at ¶ 7.  This poses an additional

24   benefit to the Class as all funds available will be distributed directly to Class

25   members, removing the need for *cy pres* relief, which is inherently a substitution for

26   direct monetary payments to the Class.

27

28

### 4.   Estimate of the amount to be paid to the Class Administrator

To date, the estimated costs incurred to administer the Settlement Agreement, plus the anticipated costs of distributing settlement funds to Class Members is estimated at $208,050.00.  Retnasaba Fee Decl. ¶ 6; *see also* Settlement Agreement § 5.3.4 (agreeing that the Claims Administrator's fees and costs shall be paid out of the Settlement Fund).

The foregoing Summary of Claims Information weighs in favor of final approval because all valid claims will be paid, no one has objected or opted out, and each Class Member will receive approximately $35.00, for a total in excess of $488,452 paid directly to the Class as cash refunds.  *See* Retnasaba Fee Decl. at ¶ 7.

### K.   The Presence of a Governmental Participant

No government entity participated in the Settlement.  All Attorneys General, however, were notified of the terms of the Settlement and none objected.  Retnasaba Decl. ¶ 2; Ball Decl. ¶¶ 3-4.  This provides assurance that consumer protection authorities across the nation believe the Settlement is fair.  Consequently, this factor favors final approval.

### L.   The Balanced Factors Weigh in Favor of Final Approval

"Ultimately, the district court's determination [regarding the fairness and adequacy of a proposed settlement] is nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.'"  *Officers for Justice*, 688 F.2d at 625 (citation omitted).  "[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution.  This is especially true in complex class action litigation." *Id.*  Here, all relevant factors weigh in favor of final approval of the Settlement, especially when considered *in toto*.

## VI.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court reaffirm its rulings certifying the Class for settlement purposes, and grant final approval to the Settlement Agreement.

1 Dated: February 13, 2014        Respectfully Submitted,

2                                             */s/ Ronald A. Marron*

3                                             RONALD A. MARRON

4                                             *ron@consumersadvocates.com*

**LAW OFFICES OF RONALD A. MARRON**

5 

6 SKYE RESENDES

ALEXIS M. WOOD

7 651 Arroyo Drive

San Diego, CA 92103

8 Telephone: (619) 696-9006

Facsimile: (619) 564-6665

9 

10 ***Class Counsel***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Mason v. Heel, Inc.*, Case No.  12-cv-3056-GPC-KSC